# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WISCONSIN

ROGER GUT,

                              Plaintiff,                          Case No. 20-CV-1111

vs.

CITY OF WAUSAU,
ROBERT P. PFAFF,
BENJAMIN J. THUMANN,
BRENT D. OLSON, AND
JOHN F. SHEAR,

                              Defendants.

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants, City of Wausau, Robert P. Pfaff, Benjamin J. Thumann, Brent D. Olson, and John F. Shear, by their attorneys, Gunta Law Offices, S.C., submit this Memorandum in Support of their Motion for Summary Judgment seeking dismissal of all claims alleged against them.

## INTRODUCTION

Law enforcement is a dangerous job, as officers are often required to act on unclear and incomplete information to protect the public and themselves in perilous circumstances. This case arises out of a 911 call initiated by Plaintiff, Roger Gut and the Wausau police departments attempt to respond to a dangerous, and uncertain situation exacerbated by Plaintiff's evasive communications. Although unclear and incomplete information may lead to the cautious detainment of a 911 caller, it does not follow that the officers' actions violated the 911 caller's Fourth Amendment rights, especially here where Plaintiff reported that someone had been shot at or near his house and then stated that he was loading his gun.

Plaintiff sued the Defendant Officers for false arrest and detention and excessive force in violation of the Fourth Amendment.  The Defendant Officers now move for summary judgment seeking dismissal of Plaintiff's Fourth Amendment claims in their entirety.  Further, Plaintiff does not have an independent claim against the City of Wausau, and only names the City for purposes of indemnification, due to the City employing Officers Pfaff, Thumann, Olson, and Shear.  Because the Defendant Officers did not violate Plaintiff's Fourth Amendment rights, the City similarly cannot be held liable.

**BACKGROUND**

Shortly after 3:00 a.m., on August 27, 2020, Marathon County 911 received a call from Plaintiff, Roger Gut.  (DPFF 9)  Mr. Gut was at his home on 606 Spring Street and reported "[s]omebody's out here, says he got shot."  (*Id.*)  Dispatch immediately asked follow up questions regarding the potential shooting to which Mr. Gut replied, "I have no idea. I would like somebody out here now, please."  (DPFF 10)  Dispatch replied "absolutely," and asked him to stay on the line. (DPFF 11)  Mr. Gut responded "yeah, I suppose. I hope you do a better job than the last time somebody came out." (DPFF 12)  Dispatch continued to try to gather information from Mr. Gut, but he was not forthcoming. (DPFF 13)  At one point, Mr. Gut advised dispatch that he was "going to load his gun to protect himself" shortly before hanging up the phone.  (DPFF 14)

Dispatch called Mr. Gut back and advised Mr. Gut that police were in the area. (DPFF 15)  Dispatch tried to gather more information about what happened, but Mr. Gut did not provide further information. (DPFF 16)  Dispatch attempted to gather information for officer safety by asking Mr. Gut about his prior statement that he was "going to load his gun." (DPFF 17)  Mr. Gut replied, "well, yeah, in case somebody comes in my house and is going to shoot me.  I'm going to have a gun to protect myself." (DPFF 18)  Dispatch then asked what kind of gun Mr. Gut had, and

2

he replied rhetorically, "I can't get a police officer in my house?" (DPFF 19) The dispatcher advised that she would get Mr. Gut an officer, but that he needed to answer her questions first. (DPFF 20) Mr. Gut replied "No . . . are you going to protect me?" (DPFF 21) Dispatch then asked if Mr. Gut had a gun on him right now, and Mr. Gut replied, "**I have a lot of weapons in my house**." (DPFF 22) The conversation continued and Dispatch stated "once the officers make sure that you do not have a weapon, they will absolutely make contact with you. They're there to help you . . . do you have a gun . . . right now?" (DPFF 25) Mr. Gut interrupted and stated, "your definition of helping and my definition of helping apparently are different." (DPFF 26) The dispatcher again advised that she could send an officer to his house but that she needed to make sure the officer would be safe. (DPFF 27) Mr. Gut replied "will they get here in the next hour or two? Thank you. Bye." (DPFF 28) He then hung up the phone on dispatch for the second time. (*Id.*)

Dispatch called Mr. Gut again. This time, Mr. Gut's wife, Beverly answered the phone. (DPFF 29) The dispatcher asked Ms. Gut questions about what happened, but Mr. Gut took the phone away and angrily stated "so, no police are coming?" (*Id.*) The dispatcher asked to speak with Ms. Gut again and Mr. Gut responded and refused to put her on the phone. (DPFF 30) The dispatcher then told Mr. Gut that officers were going to try to make contact with him, and that they needed him to walk outside with his hands up. (DPFF 31) Mr. Gut replied, "No. No. I'm not going outside – holding my hands up. I want an officer to come inside my house to protect me from these people – whatever is going on outside." (DPFF 32) Dispatch told Mr. Gut that there were six uniformed officers who were going to yell to him, and she asked if Mr. Gut could hear them. (DPFF 33) Mr. Gut responded "they're scared to come to my door or what?" (DPFF 34) Dispatch advised that they were outside his door and asked if he could look out his front door. (DPFF 35)

In the meantime, Wausau police set up a tactical approach due to the nature of the call. (DPFF 39) Wausau police were made aware via radio transmission that Mr. Gut was potentially armed, and that an individual suffering from a gunshot wound was at or near his house. (DPFF 38, 66, 91-92, 110) Officers positioned themselves to the north, south, and east of Mr. Gut's house. (*Id.*)

Lieutenant Olson radioed dispatch and instructed dispatch to ask Mr. Gut to exit the house with his hands up. (DPFF 40) Officers then began to give Mr. Gut verbal commands to exit his house with his hands visible. (DPFF 44, 70) Eventually, Mr. Gut stepped out onto his porch and yelled, "the guy is in the back of the house. I don't know why I have to do your job for you." (DPFF 44) Lieutenant Olson advised Mr. Gut that officers were checking the back of his house, but they needed for Mr. Gut to step off the porch to make sure he was safe. (DPFF 45) The Defendant Officers then requested that Mr. Gut turn around so they could see if he had a firearm on him. (DPFF 50) After Lieutenant Olson commanded Mr. Gut to turn around, he advised the other Defendant Officers that he was going to help the officers in the back of the house who had made contact with the individual that had been shot. (DPFF 53) That was the extent of Lieutenant Olson's interaction with Mr. Gut on scene. (DPFF 57, 59)

Mr. Gut turned around briefly, and then attempted to go back in house. (DPFF 102) Wausau Police Officers Shear, Thumann, and Pfaff ordered Mr. Gut to stay where he was and Mr. Gut laughed and replied, "oh yeah, well I'm going back in the house." (*Id.*) Due to his non-compliance and the rapidly evolving and dangerous nature of the situation, Officer Pfaff detained Mr. Gut for officer safety and to prevent him from going into his house. (DPFF 103) Officer Pfaff placed Mr. Gut in handcuffs. (DPFF 77)

Mr. Gut was handcuffed for less than five minutes while the officers asked him and the shooting victim questions. (DPFF 86) The shooting victim alleged that he was shot on 6th Street by a guy named Andrew Falkowski. (DPFF 63) This information was subsequently radioed out to the responding officers, and Officer Pfaff released Mr. Gut from his handcuffs when it became safe to do so. (DPFF 63-64, 86) After the handcuffs were removed, Officer Pfaff asked Mr. Gut to remain outside and answer questions, and Gut continued to argue with him. (DPFF 87-88) When the scene was clear less than ten minutes later, Mr. Gut was permitted to return inside his house. (DPFF 108)

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden to demonstrate that it is entitled to judgment as a matter of law – that no reasonable jury could reach a verdict in favor of the non-moving party. *Celotex*, 477 U.S. at 323; *Matsushita Electronics, Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."). Once this burden is met, the opposing party must go beyond the pleadings and designate the specific facts showing there is a genuine issue. *Anderson v. Liberty Lobby.*, 477 U.S. 242 (1986). Even so, the mere existence of some alleged factual dispute will not defeat summary judgment. The requirement is there be no genuine issue of material fact. *Id*. at 247-248. Nor will speculation, hearsay, or conclusory allegations suffice. *Gorbitz v. Corvilla*, 196 F.3d 879 (7th Cir. 1999).

## DISCUSSION

### I. PLAINTIFF'S FALSE ARREST AND DETENTION CLAIM AGAINST LIEUTENANT OLSON MUST BE DISMISSED FOR LACK OF PERSONAL INVOLVEMENT.

Plaintiff's false arrest and detention claim alleged against Lieutenant Olson must be dismissed as a matter of law because he was not personally involved in the alleged constitutional violation. The Seventh Circuit has made it clear that a defendant cannot be held constitutionally liable if he did not cause or participate in the alleged constitutional violation. *Hildebrandt v. Ill Dep't Nat. Resources*, 347 F. 3d 1014, 1039 (7th Cir. 2003). That is, a causal connection between the allegedly unconstitutional conduct and the defendant is necessary to establish liability. *Gentry v. Duckworth*, 65 F. 3d 55, 561 (7th Cir. 1995). Plaintiff cannot circumvent this by simply grouping all defendants together in the Amended Complaint allegations. *See Brown v. Illinois Dep't of Pub Aid*, 318 F. Supp. 2d 696, 700 (N.D. Ill. 2004), *aff'd*, 132 F. App'x 51 (7th Cir. 2005).

Plaintiff has made such an attempt here by including Lieutenant Olson in his false arrest and detention claim against the Wausau Officers. (Amended Complaint ¶¶ 47-49) However, Lieutenant Olson was attending to the victim in the back of Plaintiff's house when Plaintiff was detained. (DPFF 53, 57, 59) Further, Lieutenant Olson's later visit per Plaintiff's request also does not substantiate a false arrest or detention claim. (DPFF 129)

Courts in this circuit routinely dismiss Section 1983 claims against police officers who, like Lieutenant Olson, were not personally involved in the use of force or arrest. *Outlaw v. Vill. of Shorewood*, No. 19-CV-1092, 2021 WL 424224, at *6 (E.D. Wis. Feb. 8, 2021); *see e.g. Trout v. Frega*, 926 F. Supp. 117, 120-21 (N.D. Ill. 1996) (ruling that "[t]he mere presence of the three officers, without more, does not constitute their requisite § 1983 personal involvement in any constitutional violation which may have occurred"); *see also Smith v. Vill of Hazel Crest*, 2013

WL 182814, at 2 (N.D. Ill. Jan. 17, 2013) (dismissing Plaintiff's excessive force claims for lack of personal involvement because the defendant officer did not exert any force upon the suspect during the arrest).

Therefore, because Lieutenant Olson was not present when Plaintiff was detained, Plaintiff's false arrest and detention claim against him must be dismissed.

## II. PLAINTIFF'S CLAIM FOR FALSE ARREST AND DETENTION FAIL AS A MATTER OF LAW.

In the Amended Complaint, Plaintiff alleges that the Defendant Officers falsely arrested and/or detained him, without probable cause. Because officers are allowed to detain an individual without probable cause for safety purposes pursuant to *Terry*, the Plaintiff's claim must be dismissed.

Under *Terry v. Ohio*, a law enforcement officer is authorized to make a brief stop and frisk if he or she has reasonable suspicion based on articulable facts that a crime is about to be or has been committed or there is "danger to the policeman in the investigative circumstance." 392 U.S. 1, 26-27 (1968). While performing a *Terry* stop, officers may take steps "reasonably necessary to protect their personal safety and maintain the status quo," so that the purposes of the stop may be achieved. *United States v. Ocampo*, 890 F.2d 1363, 1369-70 (7th Cir. 1989)(*quoting United States v. Hensley*, 469 U.S. 221, 235 (1985)). "Reasonable suspicion amounts to something less than probable cause but more than a hunch." *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005); *States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000). An emergency call or an anonymous tip can serve as the basis for the reasonable suspicion. *United States v. Hensley*, 469 U.S. 221, 232 (1985).

A court in its assessment "should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). The mere use or display of force

7

in making a stop does not necessarily transform a stop into an arrest if the surrounding circumstances give rise to a justifiable fear for personal safety. *Moore* at *3; *see also United States v. Greene*, 783 F.2d 1364, 1367-68 (9th Cir. 1986). Courts in this Circuit have held that relying on guns pointed at a suspect does not ensure officer safety, and handcuffing is permissible as part of a *Terry* stop where dispatch indicates that Plaintiff is in possession of several weapons. *United States v. Moore*, No. 1:19-CR-84-HAB, 2020 WL 3170337, at *4 (N.D. Ind. June 15, 2020); *United States v. Sanders*, 994 F.2d 200, 207–08 (5th Cir. 1993); *United States v. Perdue*, 8 F.3d 1455, 1463 (7th Cir. 1983); *United States v. Glenna*, 878 F.2d 967, 972 (7th Cir. 1989) (ruling that handcuffing was permissible as part of *Terry* stop where police dispatch indicated defendants were in possession of several small weapons). Courts have long upheld this exception to probable cause because of "the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for arrest." *Terry* at 24, 88 S. Ct. at 1881. To require an officer to risk his life in order to make an investigatory stop would run contrary to the intent of *Terry*. *United States v. Hensley*, 469 U.S. 221, 235 (1985)(police officers were "well within the permissible range in the context of suspects who are reported to be armed and dangerous" in approaching, with their guns drawn . . . .); *United States v. Serna-Barreto*, 842 F.2d 965, 968 (7th Cir. 1988) (officers' drawing guns did not automatically escalate investigatory stop into an arrest where officers' safety required such a measure).

For instance, in *United States v. Moore*, a 911 caller reported that a driver of a gold Chevrolet Impala had pointed a gun at him in a Walmart parking lot. No. 1:19-CR-84-HAB, 2020 WL 3170337, at *1 (N.D. Ind. June 15, 2020). An officer was dispatched to the Walmart, and he pulled over the defendant's gold Chevrolet Impala. *Id.* The defendant calmly complied with the officer's commands, and he walked backwards towards the officer with his hands up. *Id.* The

8

defendant was ordered to the ground and handcuffed. *Id.* No gun was found on the defendant. *Id.* The defendant was then detained and placed in the back of the officer's squad car, while the officer investigated his car. *Id.* There, the Court ruled that the use of force did not exceed that necessary for an investigative stop, and that the 911 call reasonably could have led the officers to fear that the defendant was armed when he exited his vehicle. *Id.* at *4. It reasoned that when no firearm was found on the defendant's person, it was reasonable for the officers to place the defendant in the back of the squad car to limit his access to his vehicle and the firearm potentially contained therein. *Id.*

Likewise, in *United States v. Glenna*, the officers received a teletyped message that the defendant was in possession of several small armed weapons and was in route to a potential drug deal. 878 F.2d 967, 968 (7th Cir. 1989). There, the Seventh Circuit reasoned that based on the teletyped message the officers could have concluded that the defendant was armed and dangerous. *Id.* at 973. Thus, the Court ruled that placing the defendant in handcuffs for no longer than ten or fifteen minutes did not strike them as unreasonable and was consistent with a *Terry* stop. *Id.*

In this case, Plaintiff was placed in handcuffs and detained for safety purposes. Like *Glenna* and *Moore*, the Defendant Officers were under the impression that Plaintiff may be armed and dangerous based on his 911 calls that a victim had been shot and was situated just outside of Plaintiff's house; his threats to dispatch that the Wausau police better have a better response than the last time; and his statements that he was loading his gun and had lots of weapons in his house. (DPFF 38, 66, 91-92, 110) For safety purposes, the Defendant Officers commanded that Plaintiff exit his house with his hands visible. (DPFF 44, 69-70, 122-124) Plaintiff reluctantly exited his house, but remained on the porch. (DPFF 44-45, 49) The Defendant Officers had Plaintiff step off the porch and they asked Plaintiff to turn around so that they could see if he had a weapon on

9

him. (DPFF 50, 125) Plaintiff complied with the command, and the Defendant Officers ordered Plaintiff to stay where he was. (DPFF 102) Plaintiff instead defied that order, stated that he was going back into his house, and he began walking towards his house where he allegedly possessed many weapons. (DPFF 125) When Plaintiff began walking towards his house, Officer Pfaff determined that Plaintiff needed to be detained. (DPFF 76, 79) Officer Pfaff detained Plaintiff based on the nature of the incident, Plaintiff's uncooperative behavior, his refusal to follow commands, indicating he was going to go back into the residence when he was ordered out of the residence, and Plaintiff's action of turning around and taking a step back toward his residence. (*Id.*)

Plaintiff was in handcuffs for less than five minutes while the Wausau police investigated the scene. (DPFF 86) During that time, Plaintiff was uncooperative, would not give a straight answer to Officer Pfaff's questions, laughed several times and, when asked if he lived in the house, stated, "No, I broke in there. (DPFF 82-84) There's no doubt that Plaintiff's evasive answers to Officer Pfaff's questions contributed to Plaintiff's remaining in handcuffs for this brief time period.

If the Defendant Officers had not detained Plaintiff, he could have returned to his house as he repeatedly threatened to do (DPFF 76, 82), retrieved a weapon from his house and used it to harm the officers. *Terry* and its progeny have made it clear that a police officer is allowed to detain a potentially armed and dangerous individual to protect themselves.

Thus, this Court must dismiss Plaintiff's false arrest and detention claims against the Defendant Officers.

### III. PLAINTIFF'S EXCESSIVE FORCE CLAIMS FAIL AS A MATTER OF LAW.

Plaintiff alleges that the actions of the Defendant Officers in ordering him to come out of his house at gunpoint and handcuffing him behind his back at gunpoint constitute excessive, unjustifiable, and unnecessary force that violated his Fourth Amendment rights. Under the Fourth Amendment, it is entirely reasonable for an officer to have his gun drawn and to handcuff an individual claiming to be in possession of several weapons and armed with a loaded gun.

"Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871–72, 104 L. Ed. 2d 443 (1989); See *Terry v. Ohio,* 392 U.S., at 22–27, 88 S.Ct., at 1880–1883. Pursuant to *Terry*, the use of force is reasonable where it is "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Askew*, 403 F.3d 496, 508 (7th Cir. 2005) (*quoting United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995)). The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Terry* at 1879–1881. To determine whether the force used to effect an arrest was reasonable, courts must engage in a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Morfin v. City of E. Chicago*, 349 F.3d 989, 1004 (7th Cir. 2003); *quoting Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

The amount of force allowed depends on the totality of the circumstances, including, among other things, the severity of the crime at issue, whether the suspect posed a threat to the officers or others, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Id*. at 1004–05. Courts "give considerable leeway to law enforcement officers'

assessments about the appropriate use of force in dangerous situations." *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009). Courts do not find constitutional violations for gun pointing or handcuffing when there is a reasonable threat of danger or violence to police. *Baird*, 576 F. 3d at 346-47; See, *e.g., Aponte Matos \*347 v. Toledo Davila,* 135 F.3d 182, 191–92 (1st Cir.1998) (individual attempted to enter house that was being searched for weapons); *Sharrar v. Felsing,* 128 F.3d 810, 822 (3d Cir.1997) (suspect was believed to have a handgun); *Edwards v. Giles,* 51 F.3d 155, 156–57 (8th Cir.1995) (suspect fled police); *Courson v. McMillian,* 939 F.2d 1479, 1496 (11th Cir.1991) (drug crime suspects outnumbered police officer, were intoxicated, and one was verbally aggressive); *Collins v. Nagle,* 892 F.2d 489, 495–97 (6th Cir.1989) (individual approached scene in which officers were dealing with uncooperative suspects).

For example, in *Los Angeles Cty., California v. Rettele*, deputies obtained a warrant to search a house for weapons, but they were unaware that the suspects had moved out three months earlier. 550 U.S. 609, 610–11, 127 S. Ct. 1989, 1990–91, 167 L. Ed. 2d 974 (2007) (*per curiam*). When the deputies arrived at the house, they entered a bedroom with their guns drawn and found two sleeping residents, who were of a different race than the suspects. *Id.* The deputies pointed their guns at the residents, ordered the sleeping and unclothed residents out of their bed, and held them at gunpoint for several minutes before allowing them to dress. *Id.* There, the Supreme Court reasoned that when the deputies arrived, they had no way of knowing whether the African-American suspects were elsewhere in the house, and the presence of some Caucasians in the residence did not eliminate the possibility that the suspects lived there as well or that there may have been weapons near the residents. *Id.* at 613. Thus, the Court ruled that the deputies who were searching a house where they believed a suspect might be armed had authority to secure the premises. *Id.*

Like *Rettele*, the fact that Plaintiff ended up not being the suspect does not change what was known to the Defendant Officers at the time of the incident. The Defendant Officers possessed the authority to secure the premises based on Plaintiff's 911 calls.

When they arrived at Plaintiff's property, the Defendant Officers knew that Plaintiff had made threats to the 911 operator; stated that he was loading his gun and had weapons in his house; reported that there was an individual outside of his house that had been shot, but the shooting suspect was unknown; and that Plaintiff had not been very forthcoming with the operator. (DPFF 38, 66, 91-92, 110) Based on these undisputed facts, it was reasonable for the Defendant Officers to direct their firearms at Plaintiff, as he could have been the suspect or in possession of a weapon.

Further, it was reasonable for the Defendant Officers to temporarily detain Plaintiff in handcuffs briefly after he attempted to go back in his house where he claimed to have many weapons. This Circuit has held that "although 'a person has the right to be free from an officer's knowing use of handcuffs in a way that would inflict *unnecessary* pain or injury,' that right is tempered by the attendant 'risk of flight or threat of injury.'" *Howell v. Smith*, 853 F.3d 892, 900 (7th Cir. 2017); *quoting Rooni v. Biser*, 742 F.3d 737, 741–42 (7th Cir. 2014).

Plaintiff never complained of unnecessary pain or injury and he was placed into handcuffs only after he defied the Defendant Officers lawful order. (DPFF 76, 79) Plaintiff was in handcuffs for less than five minutes as a safety measure because Plaintiff claimed to have several weapons in his house, which he could have secured if he were allowed to walk back into his house. (DPFF 14, 17-18, 22) Thus, the handcuffing of Plaintiff was reasonable and necessary under the circumstances.

In addition, courts in this Circuit have consistently held that it is reasonable for an officer to detain a subject and prevent them from re-entering their house or vehicle, where a potential

weapon could be located, for the duration of an investigation. *See, e.g., Howell v. Smith*, 853 F.3d 892, 900 (7th Cir. 2017) (ruling that removing a driver from his vehicle and detaining him for thirty minutes while officers investigated the 911 call was reasonable); *United States v. Vaccaro*, 915 F.3d 431, 437–38 (7th Cir. 2019) (ruling that an officer may detain an individual for the length of an investigation pursuant to a *Terry* stop and prevent them from accessing their vehicle where they can gain control of weapons); *United States v. Moore*, No. 1:19-CR-84-HAB, 2020 WL 3170337, at *1 (N.D. Ind. June 15, 2020) (ruling that is was reasonable for the officers to detain the suspect and prevent him from accessing his car for the duration of the investigation, even though no gun was found on the suspect); *United States v. Glenna*, 878 F.2d 967, 968 (7th Cir. 1989) (ruling that detaining an individual for ten minutes based on dispatch information that the individual possessed several small weapons was reasonable); *see also Los Angeles Cty., California v. Rettele*, 550 U.S. 609, 610–11, 127 S. Ct. 1989, 1990–91, 167 L. Ed. 2d 974 (2007) (ruling that deputies may detain a non-suspect while securing a scene for safety purposes).

In this case, it would have been imprudent and unreasonably dangerous for the Defendant Officers to allow Plaintiff to go back inside his house while they were still investigating the reported shooting. The Defendant Officers had the right to point their weapons in Plaintiff's direction and to detain him based on his own threats that he was armed and dangerous.

Plaintiff's excessive force claim must be dismissed.

### IV. THE DEFENDANT OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY.

It is well settled that police officers sued under 42 U.S.C. § 1983 are entitled to qualified immunity "when they act in a manner that they reasonably believe to be lawful." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009); *see Pearson v. Callahan*, 555 U.S. 223, 244, 129 S. Ct. 808, 823, 172 L. Ed. 2d 565 (2009). The doctrine allows "ample room for mistaken

judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal quotation marks omitted). Qualified immunity "erects a substantial barrier for plaintiffs, and appropriately so because qualified immunity is designed to shield from civil liability all but the plainly incompetent or those who knowingly violate the law." *Kernats v. O'Sullivan*, 35 F.3d 1171, 1177 (7th Cir. 1994).

In order to defeat a properly raised qualified immunity defense, the plaintiff must establish two things: *first*, the undisputed facts establish an underlying constitutional violation; and *second*, the constitutional right at issue was "clearly established" with the requisite level of specificity at the time of the defendant's alleged misconduct." *Mordi v. Zeigler*, 770 F.3d 1161, 1164 (7th Cir. 2014). In the context of actions taken during a stop or arrest, police officers are entitled to qualified immunity "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Rice v. Burks*, 999 F.2d 1172, 1174 (7th Cir. 1993); *quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1983).

Plaintiff cannot make this showing because he cannot demonstrate that the Defendant Officers violated any clearly established right.

<u>First</u>, Lieutenant Olson is entitled to qualified immunity on Plaintiff's false arrest and detention claim because there is no clearly established law holding a police officer constitutionally liable when he was not personally involved in the alleged constitutional violation. Rather, as noted above, case law makes it clear that a lack of personal involvement requires dismissal of Section 1983 claims against Lieutenant Olson. *See Trout v. Frega*, 926 F. Supp. 117, 120-21 (N.D. Ill. 1996)(ruling that "[t]he mere presence of the three officers, without more, does not constitute their requisite § 1983 personal involvement in any constitutional violation which may have occurred"); *see also Smith v. Vill of Hazel Crest*, 2013 WL 182814, at

2 (N.D. Ill. Jan. 17, 2013)(dismissing Plaintiff's excessive force claims for lack of personal involvement because the defendant officer did not exert any force upon the suspect during the arrest). Thus, Lieutenant Olson is entitled to qualified immunity on Plaintiff's false arrest and detention claim.

Second, there is no case law that holds that an officer responding to a shooting incident, involving a potentially armed 911 caller cannot direct their guns at the caller or detain the uncooperative caller for safety purposes. Indeed, the case law has affirmatively held that the Defendant Officers have the right to protect themselves by directing their guns at the individual and/or placing the individual within handcuffs to protect themselves. *See Terry v. Ohio*, 392 U.S. 1, 26-27 (1968); *United States v. Hensley*, 469 U.S. 221, 235 (1985)(police officers were "well within the permissible range in the context of suspects who are reported to be armed and dangerous" in approaching, with their guns drawn . . . .); *United States v. Glenna*, 878 F.2d 967, 972 (7th Cir. 1989)(ruling that handcuffing was permissible as part of *Terry* stop where police dispatch indicated defendants were in possession of several small weapons).

Because the courts hold that there is no constitutional violation for an officer directing his firearm at a potentially armed and dangerous individual who is not cooperating with officers, or detaining and handcuffing that individual for officer safety, this Court must dismiss Plaintiff's claims against the Defendant Officers and rule that they are entitled to qualified immunity.

## VI. PLAINTIFF'S PUNITIVE DAMAGES CLAIM MUST BE DISMISSED.

Plaintiffs' Amended Complaint requests an award of punitive damages against the individual defendants. (DKT. 18, ¶¶ 8, 49) However, there is no evidence to support a claim for punitive damages as none of the Defendant Officers actions were motivated by evil intent.

In order to award punitive damages against the Defendants, a jury would have to find that their conduct was "motivated by evil motive or intent or [that] it involve[d] reckless or

16

callous indifference to the federally protected rights of others." *Soderbeck v. Burnett County*, 752 F. 2d 285, 290 (7th Cir. 1985); *citing Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640 (1983). Here, there is no evidence that any of the Defendants acted with evil motive or intent, or with callous indifference to Plaintiffs protected rights. In fact, the Defendants actions show the exact opposite.

When responding to the incident, the Defendant Officers had Plaintiff exit his home with his hands up, and they ordered him to turn around so that they could see if he had any weapons on his persons. (DPFF 45) The Defendant Officers then commanded that Plaintiff stay where he was, while the other officers investigated the back of his home. (DPFF 125) Only after the Plaintiff defied the order stay put, and he proceeded to his house where he claimed to possess many weapons, was he placed into handcuffs and detained. (DPFF 76, 79, 102-103, 125) Furthermore, Lieutenant Olson even went back to Plaintiff's home after the incident to explain that the Defendant Officers had to detain him for safety purposes due to his statements. (DPFF 128-133) These actions do not suggest any evil motive by the Defendant Officers and Plaintiff's claim must be dismissed.

**CONCLUSION**

Plaintiff essentially seeks to hold the Defendant Officers liable for detaining him for safety purposes. However, a requirement that the Defendant Officers unreasonably risk their life to conduct the investigation of a shooting incident runs afoul of the law, and *Terry* and its progeny specifically provides that an officer may point their firearms at a potentially armed and dangerous individual and/or place the individual in handcuffs for safety purposes. For these reasons and those stated above, the Defendants respectfully request that the Court grant their Motion for Summary Judgment and dismiss all claims alleged against them.

Respectfully submitted this 13th day of December, 2021.

        **GUNTA LAW OFFICES, S.C.**
        Attorneys for Defendants, City of Wausau, Robert P. Pfaff,
        Benjamin J. Thumann, Brent D. Olson and John F. Shear

        By:    */s/ Kyle R. Moore*
                Gregg J. Gunta, WI State Bar No. 1004322
                Ann C. Wirth, WI State Bar No. 1002469
                Jasmyne M. Baynard, WI State Bar No. 1099898
                Kyle R. Moore, WI State Bar No. 1101745
                Kiley B. Zellner, WI State Bar No. 1056806
                9898 West Bluemound Road, Suite 2
                Wauwatosa, Wisconsin 53226
                T: (414) 291-7979 / F: (414) 291-7960
                Email: gjg@guntalaw.com
                        acw@guntalaw.com
                        jmb@guntalaw.com
                        krm@guntalaw.com
                        kbz@guntalaw.com