IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ROGER GUT,

                    Plaintiff,

  v.

                                                                  OPINION and ORDER

CITY OF WAUSAU, ROBERT P. PFAFF,                      20-cv-1111-jdp
BENJAMIN J. THUMANN, BRENT D. OLSON,
and JOHN F. SHEAR,

                    Defendants.

---

In this lawsuit, plaintiff Roger Gut alleges that several City of Wausau police officers violated his Fourth Amendment rights by unlawfully seizing and detaining him.

Gut called 911 at around 3:00 a.m. on a summer night to report that someone was pounding on his door. The unidentified man said that he had been shot, and Gut wanted officers to come to his home immediately. During the call, Gut told dispatch that he was going to load his gun to protect himself. Gut grew frustrated with the dispatcher's follow-up questions and hung up on the dispatcher twice.

The dispatcher told officers that someone had been shot and that the 911 caller had said something about loading a gun. When the police arrived, the officers pointed their guns at Gut's front door and yelled for Gut to step outside with his hands up. Gut exited the house and stood on his front porch. After an exchange with officers, Gut started walking back into the house. The officers told Gut to stay where he was, but Gut laughed and said he was going back inside. One of the officers ran up to Gut and placed him in handcuffs. The officer questioned Gut for about ten minutes before Gut was allowed back in his house.

Both sides move for summary judgment. Dkt. 20; Dkt. 26. The case turns on the reasonableness of the defendant officers' actions in light of what they knew. Police officers may

take reasonable measures to secure the premises when they have reason to believe that responding to a call will be dangerous. The officers here knew that someone had been shot and that Gut had made comments about loading a gun. Under those circumstances, it was reasonable for officers to order Gut out of the home to ensure he was not armed. And it was reasonable for the officers to briefly restrain Gut to ensure their safety while they investigated the scene. Gut did not plead or pursue a municipal liability claim against the City of Wausau itself.

The court will grant summary judgment to defendants and close the case.

## UNDISPUTED FACTS

The following facts are undisputed except where noted.

Marathon County 911 received a call from Roger Gut at around 3:00 a.m. on August 27, 2020. Gut reported that someone was banging on his door and yelling that he had been shot. Gut said that he wanted officers to come to his home immediately. The dispatcher confirmed that they would send an officer. Gut said, "I hope you do a better job than the last time somebody came out." Dkt. 21-1 (call recording); Dkt. 21-2 (transcript).

The dispatcher asked Gut how he knew that someone had been shot. Gut said that he didn't know, and that he would not go outside to check on the person. Gut then told the dispatcher that he was "going to load my gun to protect myself." Gut hung up the phone a few seconds later.

Gut and the dispatcher soon reconnected. The dispatcher said that there were police in the area, but she wanted to know more about Gut's gun. Gut said, "well, yeah, in case someone comes into my house and is going to shoot me, I'm going to have a gun to protect myself."

2

Dispatch asked Gut what kind of gun he had. Gut replied by asking if they would send an officer to his house. Dispatch said they would send an officer, but he needed to answer her questions first. Dispatch asked whether that made sense. Gut said that it didn't. As the dispatcher began to respond, Gut interrupted and asked if they were going to protect him.

The dispatcher asked Gut whether he had a gun on him right now. Gut replied, "I have a lot of weapons in my house." When the dispatcher asked again, Gut said he wasn't carrying a weapon in his hands.

The dispatcher said that officers would make contact with Gut after they made sure that Gut did not have a weapon and the person outside the house did not have a weapon. The dispatcher again asked if Gut was carrying a gun. Gut didn't answer the question, so the dispatcher said she needed to make sure the officers on the scene would be safe. Gut replied, "will they get here in the next hour or two? Thank you. Bye." Gut then hung up the phone.

Dispatch called Gut back. The dispatcher told Gut that officers would make contact with him, but they needed Gut to walk outside with his hands up. Gut said he wouldn't do that, and that he needed an officer to come inside the home. The dispatcher told Gut that there were uniformed officers outside who were going to yell to him. Gut agreed to go look out the front door.

At some point after Gut called 911, dispatch had sent out a call to officers about the shooting. Neither party adduced recordings or transcripts of the dispatcher's communications to officers before they arrived on the scene, and the dispatcher did not sit for a deposition. But several officers testified that dispatch told them Gut had made a comment about loading a gun and that Gut had hung up the phone.

3

Six officers arrived at Gut's house, including defendants Brent Olson, Robert Pfaff, John Shear, and Benjamin Thumann. After Olson arrived at the scene, he received a message from dispatch that Gut reported he never actually saw the person who had been shot, but he heard someone come up to his door. Dkt. 21-5 (Olson body camera footage). The dispatcher also said that Gut did not currently have a weapon in his hands, but he wasn't really answering her other questions. *Id.*

Olson, Pfaff, Shear, and Thumann approached the house from the front, and two other officers approached from the back. Olson told the dispatcher to ask Gut to exit the house with his hands up. Pfaff, Thumann, and Shear pointed their weapons at the house. Officer Thumann yelled, "Wausau police department, we're outside your residence, come out with your hands visible."

Gut stepped out onto the porch wearing only a pair of gym shorts. Officer Shear yelled for Gut to show him his hands. Gut raised his hands above his head and yelled, "The guy is in the back of the house." Olson told Gut that officers were looking at the back of the house, but they needed Gut to step off the porch. Gut asked why the officers didn't come up to his house instead. One of the officers asked Gut to turn around so they could see if he had a firearm on him. Gut did so, and Olson did not see a weapon anywhere on Gut's person.

One of the officers at the back of the house radioed that he had made contact with the shooting victim. Olson stated to another officer, "Ok, you got him? They've got contact back there. Get him." Olson later testified that when he said "get him," he meant that the officers should detain Gut. Dkt. 22 (Olson Dep. 30:14–31:5). Olson then made his way to the back of the house.

4

Gut turned away from the officers and took a step towards the house. One of the officers yelled at Gut to stay where he was. Gut laughed and said he was going back in the house. Officer Shear yelled at Gut to stay where he was, and Gut stopped. Pfaff and Thumann rushed toward the porch and Pfaff placed Gut in handcuffs. Pfaff had Gut turn around and walk toward the street.

Pfaff asked Gut questions about the call and the shooting. After about five minutes, Pfaff removed Gut's handcuffs. Pfaff questioned Gut by the street for another five minutes before telling Gut that he could go back inside.

ANALYSIS

Gut contends that defendants violated his Fourth Amendment rights in three ways. First, the officers did not have justification to seize him initially. Second, the scope of his detention was unreasonable. Third, the officers used excessive force to seize him.

The general rule is that seizures are reasonable only if they are supported by probable cause to believe an individual has committed a crime. *See, e.g., Dunaway v. New York*, 442 U.S. 200, 213 (1979). But in certain circumstances, police may detain individuals with less than probable cause if the scope of the seizure is limited and the detention advances an interest in crime prevention or officer safety. *Bailey v. United States*, 568 U.S. 186, 193 (2013). To determine whether a seizure short of arrest is reasonable, the court first considers whether the detention was justified from the outset and then asks whether the detention was reasonably related in scope to the circumstances justifying the seizure. *Matz v. Klotka*, 769 F.3d 517, 524 (7th Cir. 2014) (citing *Terry v. Ohio,* 392 U.S. 1, 20 (1968)).

Summary judgment is appropriate if the moving party shows that there is no genuine dispute of material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). On cross-motions for summary judgment, the court evaluates each motion separately, construing the facts and drawing all reasonable inferences from those facts in favor of the nonmovant. *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008). If the material facts are undisputed, the constitutionality of an officer's conduct is a question of law for the court to decide. *See Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003).

### A. Defendants' knowledge

A threshold question relates to evidence of what the officers knew about Gut's comments to the dispatcher. Three of the officers testified that dispatch told them that Gut had made comments about loading his gun. Dkt. 23 (Pfaff Dep. 24:13–15); Dkt. 24 (Thumann Dep. 33:10–16); Dkt. 25 (Shear Dep. 6:20–22). (Olson wasn't as specific; he testified that Gut had made "concerning statements" to dispatch. Dkt. 22 (Olson Dep. 18:4–8)). Gut attempts to dispute that testimony in his proposed findings of fact. *See* Dkt. 37, ¶¶ 66, 91, 112. The dispute would be material because whether Gut's detention was reasonable depends on what the officers knew at the time of the seizure. *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003). The question is whether Gut has raised a genuine dispute, which is one where both competing versions of the facts have evidentiary support.

The parties adduced full transcripts and recordings of Gut's call with the dispatcher. But neither party adduced transcripts or recordings of dispatch's communications to the officers, and the dispatcher did not sit for a deposition. The only evidence in the record about what dispatch told the officers prior to their arrival on the scene is the officers' testimony.

6

Defendants' testimony is admissible evidence, so the court will credit their testimony unless Gut can identify evidence that disputes it.

Gut attempts to dispute the officers' testimony by citing a communication from dispatch that was sent after the officers arrived on the scene. The message happened to be captured on Olson's body camera. In that message, the dispatcher does not mention anything about loading a gun. Dkt. 21-5 (Olson body camera footage at 1:45–2:15).

But the cited evidence does not create a genuine dispute. The communication captured on Olson's body camera does not contradict the officers' unequivocal testimony that dispatch had told them that Gut was loading his gun. The fact that dispatch did not mention Gut loading his gun in a later message captured on video does not imply that dispatch never mentioned it before officers arrived on the scene. Gut can only speculate about what else dispatch did or didn't tell the officers, which is not enough to create a genuine dispute or defeat summary judgment. *See Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 337 (7th Cir. 1991). The court will credit the officers' undisputed testimony about what the dispatcher told them.

**B. Initial seizure**

Gut contends that the officers did not have justification to seize him. Gut argues that (1) his seizure was only justified if the officers had probable cause; and (2) even if the officers did not need probable cause, his seizure was not justified by reasonable suspicion or concern for officer safety. The court will address both contentions.

    **a. Probable cause**

Gut contends that the officers needed probable cause to seize him because he was seized in or around his home. The parties dispute where Gut was first seized. Gut says he was seized when he complied with the officer's orders to step outside of his home; defendants say that

7

Gut wasn't seized until he was handcuffed on his porch. But Gut contends that a seizure in either location required probable cause. Dkt. 34, at 10.

Gut was seized when he complied with the officers' demands to step outside onto his porch. A seizure occurs when a person submits to an officer's show of authority and his freedom of movement is restrained. *California v. Hodari D.*, 499 U.S. 621, 626–27 (1991). A show of authority exists when an officer's words and actions would lead a reasonable person to believe they were not free to disregard them. *Id.* at 628. Here, multiple officers yelled at Gut to step outside with his hands visible, which is not an order that a reasonable person would assume is optional. *See Gentry v. Sevier*, 597 F.3d 838, 845 (7th Cir. 2010). And Gut complied with the officers' orders by stepping outside.

But officers did not need probable cause to make that seizure. An officer needs both probable cause and a warrant to *enter* a home to arrest someone inside. *Payton v. New York,* 445 U.S. 573, 589 (1980). But those requirements exist to protect against physical entry into the home, the chief evil the Fourth Amendment was designed to prevent. *Id.* Ordering someone to step outside their house does not implicate the same privacy concerns. *See United States v. Berkowitz*, 927 F.2d 1376, 1386 (7th Cir. 1991) (holding that police did not need a warrant to convey a message of arrest to someone inside). Moreover, the cases Gut cites all concern *arrests* inside the home, and arrests require probable cause regardless of where they take place. *Dunaway v. New York*, 442 U.S. 200, 213 (1979). Gut does not contend that his initial seizure was an arrest, so the officers did not need probable cause to order him outside.

For similar reasons, the officers did not need probable cause to seize Gut on the porch. Police may not engage in warrantless searches of a home's curtilage, which includes the front porch. *Florida v. Jardines,* 569 U.S. 1, 7 (2013). But for seizures, a warrant is only required to

enter the home; the line is drawn at the front door. *Berkowitz*, 927 F.2d at 1386. Accordingly, the Seventh Circuit has held that a seizure on a porch can be justified without a warrant and on less than probable cause. *United States v. Richmond*, 924 F.3d 404, 412 (7th Cir. 2019); *see also United States v. Pace*, 898 F.2d 1218, 1223 (7th Cir. 1990) (upholding a *Terry* stop of a defendant in his condominium garage).

### b. Justification

An officer may briefly detain an individual under two circumstances related to this case. First, a brief detention is authorized if the officer has reasonable suspicion that an individual is engaged in criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 20-21 (1968). Second, restraining an individual may be appropriate in situations that are inherently dangerous, even if the officers do not suspect the individual of a crime. *Estate of Biegert v. Molitor*, 968 F.3d 693, 699 (7th Cir. 2020). That kind of seizure can be justified if the additional intrusion on individual liberty is marginal and is outweighed by the officer's interest in conducting police activities safely. *United States v. Howard*, 729 F.3d 665, 659 (7th Cir. 2013).

The court concludes that Gut's seizure was justified on both grounds. First, the officers were entitled to detain Gut to ensure that they could safely investigate the scene. The officers knew that someone had been shot. The inherent danger of gun violence sets shootings apart from other criminal activity and provides a compelling reason to detain individuals on the scene. *United States v. Rickmon*, 952 F.3d 876, 883 (7th Cir. 2020). And officers have a significant interest in securing the premises if weapons are likely to be present. *See Los Angeles County v. Rettele*, 550 U.S. 609, 613 (2007). Here, officers knew that Gut had told the 911 dispatcher something about loading his gun, so they had reason to believe that there was at least one gun on the scene.

There was also much that the officers didn't know. They didn't know the identity of the shooter or where the shooter was at the time. They didn't know where the victim was; Gut said that the victim was pounding on his door, but he didn't specify whether it was the back door or the front. And they didn't know how Gut would react when the officers arrived. Under the circumstances, it was reasonable for the officers to conclude that it was necessary to detain Gut to be able to investigate the scene safely and without interference.

Second, the officers had reasonable suspicion that Gut may have been involved with the shooting. Reasonable suspicion is a less demanding standard than probable cause. *Matz v. Klotka*, 769 F.3d 517, 522 (7th Cir. 2014). An officer must be able to articulate specific facts that led them to suspect the person seized. *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999). Reasonable suspicion is determined in light of the totality of the circumstances. *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003).

Here, the officers knew that someone had been shot, and that Gut had said that he was loading a gun. Those facts alone could lead a reasonable officer to suspect that Gut was the shooter. A suspect's demeanor and behavior can also support an officer's reasonable suspicion. *United States v. Adair*, 925 F.3d 931 (7th Cir. 2019). The officers knew that Gut was not answering all of dispatch's questions and had hung up on dispatch at least once. Gut's odd behavior towards the dispatcher is not inherently suspicious—having someone pound on your door at 3:00 a.m. could cause a person to act erratically. But when officers confront behavior that could be innocent or criminal, they are allowed to detain the suspect to resolve the ambiguity. *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). In light of everything the officers knew at the time, it was reasonable to detain Gut to dispel their suspicions.

### C. Wrongful arrest

Gut contends that even if officers had initial justification for the seizure, the officers escalated his detention into a full arrest by pointing their guns at him, handcuffing him, and detaining him by the street for ten minutes.

A *Terry* stop may be transformed into a formal arrest requiring probable cause if (1) an officer's use of force is disproportionate to the purpose of the stop, *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013) or (2) the seizure continues longer than is necessary. *United States v. Bullock,* 632 F.3d 1004, 1015 (7th Cir. 2011). The court concludes that the officers used proportionate force and that the seizure was not unnecessarily long.

#### a. Disproportionate force

Factors to consider when determining whether the use of force was disproportionate to the purpose of the stop include whether circumstances gave rise to a justifiable fear for personal safety on the part of the officer, *United States v. Tilmon,* 19 F.3d 1221, 1226 (7th Cir. 1994), and the defendant's own actions in resisting an officer's efforts. *United States v. Lawshea*, 461 F.3d 857, 860 (7th Cir. 2006). In assessing whether the use of force escalated a stop into a full arrest, a court "should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

The same concerns for officer safety that justified the fact of Gut's detention also justified the officers' use of force. "The use of a firearm and handcuffs undoubtedly puts [a police] encounter at the outer edge of a permissible *Terry* stop." *Matz,* 769 F.3d at 525. But their use is not categorically disproportionate to the needs of a limited seizure. *See id.*; *Bullock,* 632 F.3d at 1016. It can be reasonable for officers to draw their weapons on a suspect when

11

they respond to a 911 report of a shooting because of the danger inherent to that situation. *See United States v. Shoals*, 478 F.3d 850, 853 (7th Cir. 2007). Pointing a weapon to detain someone can also be reasonable if officers have reason to believe that the individual is armed. *See Matz*, 769 F.3d at 520; *Howard*, 729 F.3d at 660; *United States vs. Ocampo*, 890 F.2d 1363, 1369 (7th Cir. 1989).

Here, the officers knew that someone had been shot, and they did not know whether the shooter was still on the premises. And all the officers knew about Gut was that he had said something about loading his gun. The officers had reason to believe that Gut could be armed, so it was reasonable for them to think that drawing their weapons was necessary to ensure their own safety. This is so even though Gut stepped out onto the porch wearing only his boxers. It was reasonable for the officers to fear that Gut had a weapon in his waistband, which is why the officers asked Gut to turn around so they could see his back.

The officers kept their weapons trained on Gut even after they saw that Gut had nothing in his waistband. At that point, it was not reasonable to assume that Gut had a weapon on his person. But the officers only kept their guns pointed at Gut for about a minute after Gut turned around. *See* Dkt. 27-1 (Shear body camera footage at 15:20–16:30). This was a quickly-developing situation where the officers were making snap judgments about what was necessary to protect themselves. And the officers still did not know if there was another shooter or weapon present at the scene. Under those circumstances, it was reasonable for the officers to continue pointing their weapons at Gut for a short time. A longer amount of time may have made the use of force disproportionate. For example, in *Jacobs v. City of Chicago*, the court of appeals concluded that it was unreasonable for an officer to point his gun at a person for over

12

ten minutes after learning that the person was not a threat. 215 F.3d 758, 773 (7th Cir. 2000). But the use of guns here did not escalate Gut's seizure into an arrest.

It was also reasonable to place Gut in handcuffs. Gut was placed into handcuffs only after he turned away from the officers and said that he was going to go back inside the house. That makes the use of handcuffs more reasonable, for two reasons. First, even though Gut didn't have a weapon on his person, the officers knew (or reasonably assumed) that he had one in his house. A reasonable officer could believe that allowing Gut to enter his home posed a risk to the officers' safety. Second, it demonstrated that Gut would not necessarily comply with the officers' commands. In that situation, an officer may use force to effectuate the stop and ensure compliance with their orders. *See U.S. v. Felix-Felix*, 275 F.3d 627, 636 (7th Cir. 2001). It was reasonable for Pfaff to briefly place Gut in handcuffs to ensure that he could question Gut safely and that officers could secure the scene without interference.

### b. Length of the seizure

Gut's seizure was not unnecessarily long. Gut was detained for around ten minutes, from the moment he stepped outside until he was allowed back inside of the house. The Seventh Circuit has described ten to fifteen minutes as a minimal amount of time to be seized. *United States v. Glenna*, 878 F.2d 967, 973 (7th Cir. 1989). Even longer detentions can be appropriate so long as the officers are working diligently to fulfill the purpose of the stop. *See, e.g.*, *Bullock*, 632 F.3d at 1011 (thirty to forty minutes); *Rabin*, 725 F.3d at 634 (an hour and a half). Gut provides no reason to believe that officers were not working diligently to find the victim and secure the scene. And Pfaff worked to confirm or dispel his suspicion that Gut was involved in the shooting when he detained Gut by the street. Pfaff removed Gut's handcuffs about twenty seconds after Gut gave Pfaff his account of the incident, Dkt. 23 (Pfaff body

camera footage at 20:10–59), and he continued to ask Gut questions until Gut was allowed back in his home.

Gut contends that even if Pfaff had reasonable suspicion that Gut was involved in the shooting, his detention became unreasonable when Pfaff learned that Gut was not the shooter. After Olson went around to the back of Gut's house, he made contact with the victim of the shooting. The victim said that he had been shot on 6th street, and he gave the name of the shooter. Dkt. 21-5, at 11:20. Olson then communicated the location of the shooting and the name of the shooter over the radio. That message went out about ten seconds after Pfaff placed Gut in handcuffs.

There is evidence in the record that Olson's message was sent to every officer on site, though the parties dispute whether Pfaff heard it. The dispute is immaterial, for two reasons. First, concerns about officer safety provided an independent ground to keep Gut detained until the officers had the scene under control. Second, even if Pfaff heard that the victim had identified someone else as the shooter, it was still reasonable for Pfaff to be suspicious of Gut. Pfaff still did not have an explanation for Gut's comment about loading a gun. He did not know Gut's relationship to the victim or why he was at Gut's house. And he did not know if there were any other victims. Under those circumstances, it was reasonable to keep Gut detained for another few minutes to get a clearer picture of the situation and dispel any residual doubt.

D. Excessive force

Gut brings a separate claim for excessive force, contending that it was unreasonable for the officers to handcuff Gut and point their weapons at him. The test for whether force was excessive is materially the same as the test used to determine whether force escalated a

14

detention into a full arrest; both turn on the potential danger to the officers and the detainee's efforts to resist the officers. *See Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009) (excessive force standard); *Matz*, 769 F.3d at 524 (detention standard). As a matter of common sense, force cannot be both proportionate and excessive. So the court does not need to repeat its analysis. The use of handcuffs and weapons was not excessive for the same reasons why their use was not disproportionate to the needs of Gut's seizure.

## CONCLUSION

The officers in this case were responding to a potentially dangerous situation. At least one person had been shot and the officers knew that there was at least one gun on the premises, where the resident had communicated the intent to prepare for armed confrontation. Under those circumstances, it was reasonable for the officers to detain Gut to ensure that they could safely investigate the scene. The officers had justification to seize Gut, and the scope of Gut's detention was proportionate to the apparent risk to the officers on the scene. Gut's seizure did not violate the constitution, so defendants are entitled to summary judgment on all of Gut's claims.

## ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 20, is GRANTED.
2. Plaintiff Roger Gut's motion for partial summary judgment, Dkt. 26, is DENIED.

3. The clerk of court is directed to enter judgment for defendants and close this case.

Entered March 21, 2022.

                                              BY THE COURT:

                                              /s/

                                              _____

                                              JAMES D. PETERSON
                                              District Judge